### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF NEW YORK

_____

JASON WIMBERLY,

Plaintiff,                              Case No. \_\_\_-cv-\_\_\_\_\_

— against —                        Trial By Jury Demanded

ATLANTIC DIALYSIS MANAGEMENT SERVICES, LLC; CENTRAL PARK DIALYSIS CENTER; TERRENCE CARDINAL COOKE HEALTH CARE CENTER / ARCHCARE; GOLDBERG SEGALLA LLP; SCOTT R. GREEN; CHARLES LAZO; HILARIO FLAUTA LORNA BAUTISTA, R.N.; PAULINE [LAST NAME UNKNOWN]; ENRIQUE [LAST NAME UNKNOWN]; YASMIN [LAST NAME UNKNOWN]; FAUSI [LAST NAME UNKNOWN]; JACKIE [LAST NAME UNKNOWN]; ROSEMARY JOHNSON; GLENN [LAST NAME UNKNOWN]; JAVITA BANKS, LMSW; RACHEL JAGDEO; JODUMUTT GANESH BHAT, M.D.; and PREMILA BHAT, Defendants.

**FIRST AMENDED CIVIL COMPLAINT [1] AND JURY DEMAND**

_____

[1] The sole amendments are the inclusion of Hilario Flauta as a Defendant in the caption, and his inclusion in claims that his name was in

Plaintiff Jason Wimberly ("Plaintiff"), proceeding pro se, respectfully submits this Complaint against the above-captioned Defendants (collectively, "Defendants") and alleges as follows:

## PRELIMINARY STATEMENT

1. This action arises from a nearly three-year campaign of retaliation, coercion, physical abuse, civil-rights interference, and medical negligence directed against a critically ill dialysis patient because he asserted his legal rights. At its heart lies one question: how far will an institution existentially dependent on federal funds go to conceal its ongoing violations of law and of the Conditions for Coverage set by CMS? Dialysis providers wield near-total power over patients for whom missed treatment means imminent death, and courts should treat the complaints of such patients with the utmost solicitude.

2. Plaintiff suffers from end-stage renal disease ("ESRD"), congestive heart failure with a left ventricular ejection fraction of 39%, hypertrophic cardiomyopathy, supraventricular tachycardia ("SVT"), Ehlers-Danlos Syndrome ("EDS"), obstructive sleep apnea, a confirmed MTHFR mutation causing elevated homocysteine, anxiety, and PTSD. He depends on hemodialysis three to four times per week to survive.

3. When Plaintiff filed a federal lawsuit in December 2024 challenging Defendant Atlantic's discriminatory conduct, Defendants did not merely defend the case — they launched an escalating campaign to punish him. Within weeks, Defendant Green authored a letter on Goldberg Segalla letterhead accusing Plaintiff of "harassment" based on allegations Plaintiff later discovered facility staff had been overheard fabricating, and demanded Plaintiff restrict

communications about his own medical care — conditioning access to life-sustaining dialysis on the surrender of his statutory and constitutional rights to speak.

4. Following Judge Oetken's April 29, 2025 dismissal of the original action, Defendants escalated. Within eleven days, Atlantic issued a punitive "Behavioral Plan" restricting Plaintiff to one rescheduled session per week and directing that additional rescheduling needs be met in the emergency room — pushing Plaintiff from an integrated community setting toward the most restrictive institutional setting in violation of *Olmstead v. L.C.,* 527 U.S. 581 (1999). The Plan was never applied to any other patient and was quietly abandoned after Plaintiff perfected his Second Circuit appeal — a tacit admission of retaliatory purpose.

5. Meanwhile, Atlantic's staff lied to Plaintiff about chair availability to block rescheduling, failed to arrange legally required transportation resulting in missed dialysis, refused to produce billing records and incident reports, stonewalled social-work support, prematurely terminated treatments, and physically abused Plaintiff — including a technician slapping him, another repeatedly tearing skin from his arm, and another throwing surgical masks at him. Corrective efforts materialized only after the credible specter of enforcement became imminent.

6. Plaintiff acknowledges the breadth of this Complaint but respectfully submits that raising all ripe issues now avoids piecemeal litigation.

## JURISDICTION AND VENUE

7. This Court has original subject-matter jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims arising under the Americans with Disabilities Act, 42 U.S.C. § 12203; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961–1968; and 42 U.S.C. §§ 1983, 1985(2), 1985(3), and 1986.

8.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims arising under the New York City Administrative Code §§ 8-107 et seq., New York Executive Law §§ 290 et seq., New York Public Health Law §§ 2801-d and 2803-c, New York Judiciary Law § 487, the New York Constitution, and New York common law.

9.  Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in New York County.

10.  Certain state-law claims herein were previously asserted in *Wimberly v. Atlantic Dialysis Management Services, LLC,* No. 24-cv-9269 (JPO) (S.D.N.Y.). On April 29, 2025, Judge Oetken dismissed the federal claims with prejudice and the state-law claims without prejudice; on June 13, 2025, the Court denied reconsideration and advised that further relief must be sought "in the form of a timely appeal . . . or a newly filed action." (ECF No. 69.) The dismissed federal claims are on appeal to the Second Circuit. This is the newly filed action. The state-law claims reasserted herein were dismissed without prejudice and are timely refiled. The federal claims asserted herein arise from post-dismissal conduct, from conduct not at issue in the prior action, or from claims that could not previously be added because leave to amend was denied.

## PARTIES

11.  Plaintiff Jason Wimberly is a natural person and citizen of New York residing in New York County. He suffers from ESRD, congestive heart failure (LVEF 39%), hypertrophic cardiomyopathy, atrial fibrillation, SVT, aortic root dilation, coronary artery calcification, EDS, obstructive sleep apnea, asthma, COPD, anxiety, PTSD, an MTHFR mutation, and cervical and

lumbar spine pathology. He is disabled within the meaning of the ADA, the Rehabilitation Act, and the New York State and City Human Rights Laws.

12.  Defendant Atlantic Dialysis Management Services, LLC ("Atlantic" or "ADMS") is a New York LLC and management services organization operating approximately 13–14 dialysis clinics in New York, including Defendant Central Park Dialysis Center ("CPKDC") at 1249 Fifth Avenue, New York, NY, located on the second floor of Defendant Terrence Cardinal Cooke Health Care Center ("TCC"), an ArchCare facility. ADMS, CPKDC, and TCC are places of public accommodation, recipients of federal financial assistance, and healthcare facilities subject to N.Y. Pub. Health Law §§ 2801-d and 2803-c.

13.  Defendant Jodumutt Ganesh Bhat, M.D. ("Dr. Bhat") is a nephrologist serving as Principal and Chief Executive Officer of ADMS, President of CPKDC, and Medical Director of New York Renal Associates, Inc. ("NYRA"), an ADMS-affiliated facility; upon information and belief he is the majority shareholder of CPKDC and NYRA. Defendant Premila Bhat is, upon information and belief, an officer and/or principal of one or more ADMS-affiliated entities.

14.  Defendant Goldberg Segalla LLP ("Goldberg Segalla" or "GS") is a New York law firm that served as litigation counsel to Atlantic in the prior federal action. Defendant Scott R. Green ("Green") is a GS partner who personally authored and signed the correspondence described herein. Defendant Charles Lazo ("Lazo") is a GS attorney who personally made the representations to the Court described herein. Both are sued in their individual capacities.

15.  Defendants Lorna Bautista, R.N. ("Nurse Lorna"), Pauline, Enrique, Yasmin, Fausi, Jackie, Rosemary Johnson, Glenn, JaVita Banks, LMSW ("Ms. Banks"), Rachel Jagdeo, and Hilario Flauta (Administrator) are, upon information and belief, employees or agents of

ADMS/CPKDC who personally participated in the conduct alleged herein and are sued in their individual capacities. Full names unknown to Plaintiff will be supplied upon discovery.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Medical Vulnerability

16.  Plaintiff's cardiac fragility was known to Defendants from hospital records predating his treatment at CPKDC. On January 15, 2023, Plaintiff was admitted to the Mount Sinai Morningside MICU with hypertensive emergency and NSTEMI Type 2 versus myocarditis, blood pressure of 205/142, troponin of 2.08 ng/mL (approximately fifty-two times the upper limit of normal), ischemic ECG changes, and hypoxemia requiring BiPAP. A September 2025 cardiac MRI revealed severe biventricular enlargement, an ejection fraction of 39%, possible hypertrophic cardiomyopathy, multi-valve regurgitation, and possible pulmonary hypertension. Plaintiff's documented SVT has reached 255 beats per minute.

17.  Plaintiff's EDS causes joint subluxation and skin that tears easily; his sleep disorders (obstructive sleep apnea and severe sleep-stage-shift disorder, with 100–150 stage shifts nightly) cause debilitating fatigue and habitual lateness — a recognized symptom requiring scheduling accommodation. Plaintiff's MTHFR mutation causes dangerously elevated homocysteine requiring monitoring.

**B. Medical Negligence**

18.   Atlantic maintained Plaintiff on a dialyzer filter rated for patients weighing 70 kilograms or less for twenty-three months despite Plaintiff exceeding that weight for the entire period. Atlantic failed for months to monitor Plaintiff's homocysteine despite his confirmed MTHFR mutation, cardiomyopathy, and sleep apnea, and changed course only after Plaintiff's first lawsuit.

19.   Upon information and belief, Defendants' failure to prescribe an appropriately calcium-balanced dialysate caused Plaintiff's calcium to decline and his parathyroid hormone ("PTH") to rise into severe secondary hyperparathyroidism — approximately double the level considered acceptable even for ESRD patients — placing Plaintiff at risk of osteitis fibrosa cystica, marrow fibrosis, pancytopenia, and erythropoietin resistance. Plaintiff's white blood cell count fell as low as 2.8; his counts began improving only after Plaintiff himself researched and recommended changes to iron dosing and dialysate concentration.

20.   On a date known to Defendants, Plaintiff went into SVT during treatment — a life-threatening emergency. Staff called their contracted private ambulance company, Senior Care, rather than 911. After waiting nearly twenty minutes, Plaintiff exited the facility and called 911 himself; FDNY arrived within approximately five minutes and administered adenosine in TCC's driveway to break the tachycardia, briefly stopping Plaintiff's heart and producing the "air hunger" and crushing chest-pressure sensations characteristic of that drug.

21.   Defendants Yasmin and Fausi repeatedly ripped tape from Plaintiff's fistula sites at the end of sessions, tearing his skin at the epidermal layer, leaving flecks of skin on the tape and his dermis exposed and bleeding. His left arm is permanently scarred. Defendants knew of Plaintiff's EDS.

**C. Transportation Failures and False Statements Regarding Transportation Obligations**

22.   Plaintiff is a Medicaid enrollee entitled to non-emergency medical transportation ("NEMT") to and from dialysis. Under 18 N.Y.C.R.R. §§ 505.10 and 505.11 and the procedures of Medical Answering Services ("MAS"), New York's transportation prior-authorization broker, dialysis clinics must enter or adjust transportation orders — including standing orders and adjustments for rescheduled sessions — before transportation will be provided.

23.   On numerous occasions CPKDC's social-work department failed to enter or adjust the required orders, and permitted Plaintiff's six-month standing orders to lapse despite weeks of advance notice from MAS. As a direct result, Plaintiff repeatedly had to walk to or from dialysis, take public transit while symptomatic, pay out of pocket for Uber, Lyft, or yellow-cab service from his limited SSDI income, or miss treatment entirely and summon an ambulance to a hospital.

24.   On one documented occasion, after 5.5 kilograms of fluid had been removed from his body, Plaintiff — suffering presyncope, cramping, dizziness, and SVT-elevated heart rate — was forced to walk home in the rain because no CPKDC staff member would log into the MAS platform to change the cab company, despite an MAS agent on a live three-way call confirming that this single step was all that was required, and despite nurses seated directly in front of him.

25.   On October 25, 2025, Plaintiff's phone service was disconnected. He called CPKDC via Google Voice asking staff to update his contact number with the transportation provider. Staff failed to do so, failed to call back as promised, and refused to answer his calls — Plaintiff having previously observed staff view caller ID and decline to answer when his number

appeared. Plaintiff missed dialysis that day. He contemporaneously emailed GS attorneys Green and Lazo, placing them on notice.

26.  Throughout this period, Defendants — including through counsel — represented to Plaintiff, and in the prior action to the Court, that ADMS had no obligation to arrange Plaintiff's dialysis transportation. Those representations were false: applicable Medicaid regulations and MAS procedures place the ordering and adjustment function on the facility. These false statements, transmitted by interstate wire (email and the Court's electronic filing system), caused Plaintiff to spend his own funds on transportation the facility was obligated to arrange, and to forgo remedies he would otherwise have pursued.

**D. The Prior Federal Action and the January 30, 2025 Goldberg Segalla Letter**

27.  In December 2024, Plaintiff filed *Wimberly v. Atlantic Dialysis Mgmt. Servs., LLC,* No. 24-cv-9269 (JPO) (S.D.N.Y.), alleging disability discrimination arising largely from the transportation failures described above. On or about January 24, 2025, Atlantic, through Goldberg Segalla, moved to dismiss.

28.  On January 30, 2025 — the same day Plaintiff filed a patient-safety complaint reporting a technician illegally pushing IV medication — Defendant Green authored and sent Plaintiff a letter on GS letterhead (iManage No. 2796\0072\45207625.v2) that: (a) demanded Plaintiff direct all litigation communications exclusively to Green and Lazo; (b) instructed that discussions about Plaintiff's own dialysis treatment "should involve counsel"; (c) accused Plaintiff of harassment based on unnamed employee reports with no dates, descriptions, or details, and grossly mischaracterized those for which any detail was provided; (d) threatened unspecified "further action"; (e) enclosed "Patient Standards of Conduct" and stated that by

continuing treatment Plaintiff was "agreeing to abide by" its terms; and (f) noted Plaintiff had declined an in-person meeting "to discuss [his] behavior." The ".v2" designation evidences ***deliberation*** and ***review***.

29.  That same day, Plaintiff responded by email to Dr. Bhat, copying Green, Lazo, and other GS attorneys, identifying the letter as an attempt to bind him "into a contract for silence in exchange for life saving treatment."

### E. The Fabricated Harassment Allegations

30.  On February 24, 2025, while walking to the weigh scale at CPKDC, Plaintiff overheard two technicians — Fauzi and Bridget (mother of Dwight, an employee upon whose purported complaint the GS letter was partly predicated) — discussing which employees would "internally" claim that Plaintiff had harassed them. Upon realizing Plaintiff had overheard, they stopped mid-sentence. Plaintiff reported this to Defendant Green by email on February 25, 2025.

31.  This incident is direct evidence that the harassment allegations in the January 30, 2025 letter were not organic complaints but were fabricated or coordinated. Each technician named in Plaintiff's written complaints had a personal motive to reframe the complaining patient as the aggressor, and ADMS management had an institutional motive to adopt that reframing because Plaintiff's written complaints were creating a paper trail exposing systemic failures.

### F. False Representations to the Court in the Prior Action

32.  In the prior action, Defendant Lazo represented to the Court that permitting Plaintiff to reschedule dialysis sessions would require the facility to "waste" materials. The representation

was demonstrably false. CPKDC uses the Nikkiso DBB-06 system; every per-session disposable — AV-06 bloodline sets (3–5 year shelf life), dialyzer filters, fistula needles, saline (18–24 months), heparin (3 years), doxercalciferol, levocarnitine, Venofer, and Epogen — is shelf-stable for months to years in sealed packaging, and under standard clinical protocol IV medications are not even drawn until after the patient arrives and treatment commences. Nothing is "wasted" by a pre-arrival reschedule.

33.  Defendants further represented to the Court, in substance, that Plaintiff was harassing facility staff — when the contemporaneous email record demonstrates Plaintiff was the victim of repeated staff-on-patient misconduct — and that Plaintiff sought unlimited reschedules for no legitimate reason, when Defendants knew of the combination of debilitating conditions and ongoing legal proceedings that necessitated scheduling flexibility. Defendants also made false representations regarding the requirements of 18 N.Y.C.R.R. §§ 505.10 and 505.11. Upon information and belief, the staff's reframed harassment narrative was communicated to Goldberg Segalla, which presented it to the Court as fact; whether uncritically relayed or knowingly adopted, the narrative was materially false and inverted a documented reality.

**G. The Post-Dismissal Behavioral Plan**

34.  Judge Oetken dismissed the prior action on April 29, 2025. Eleven days later, on May 10, 2025, Atlantic issued Plaintiff a "Behavioral Plan" restricting him to one rescheduled session per week and directing that further rescheduling needs be met by "ER diversion" — directing a chronically ill outpatient into the most restrictive treatment setting. The Plan was issued on the letterhead of Ridgewood Renal & Medical Associates, P.C. — an ADMS-developed facility listed on ADMS's own corporate overview — creating the false appearance

that it originated from an independent clinical source, when it was generated within the ADMS network. Its provisions tracked the framework of the January 30, 2025 GS letter, giving rise to the inference that it was coordinated with or approved by counsel.

35. The Behavioral Plan was never presented to any other patient at CPKDC and was quietly abandoned after Plaintiff perfected his Second Circuit appeal.

**H. Chair-Availability Falsehoods, Premature Terminations, and the Do-Not-Document Directive**

36. On March 7, 2026, when Plaintiff sought to reschedule, CPKDC staff told him by telephone that "Lorna said . . . we don't have a space." Plaintiff's contemporaneous text message to administrator Patrick Acosta documented four empty chairs (7, 10, 15, and 14). Plaintiff possesses audio-recorded evidence related to this incident.

37. On March 21, 2026, Defendant Nurse Lorna terminated Plaintiff's treatment fifty-seven minutes early despite three empty chairs — exposing a patient with an EF of 39%, possible hypertrophic cardiomyopathy, multi-valve regurgitation, and documented SVT to 255 bpm to a foreseeable risk of decompensation, arrhythmia, and death. Lorna then instructed Plaintiff not to document the incident. This was not an isolated event: Atlantic on numerous occasions involuntarily terminated Plaintiff's sessions early when neither space nor staffing required it.

38. Nine days earlier, on March 12, 2026, Plaintiff had emailed Dr. Bhat — copying Acosta, Dr. Stalbow, Ms. Banks, TCC nursing staff, and GS attorneys Green and Lazo — documenting that CPKDC could not control ambient temperature because TCC's ventilation "takes over"; that Plaintiff sat at station 19 directly beneath a vent blowing cold air while the

outdoor temperature was 36°F; that he was freezing under two blankets; that adjacent patients confirmed the cold; that Charge Nurse Cherissa personally verified the airflow; and that both facility thermometers had been broken since Plaintiff's treatment began. Temperature control is a well-established component of the dialysis standard of care for anemic, iron-deficient ESRD patients.

**I. Suppression of Grievances, Social-Work Failures, Staff Abuse, and Records Stonewalling**

39.    Defendant Banks approached a patient who had been discussing shared transportation concerns with Plaintiff and told her not to listen to "anyone else" because "it's all gossip," then switched to Spanish to exclude Plaintiff — an effort to suppress patient-to-patient communication about documented care failures and Plaintiff's stated intent to pursue legal action.

40.    When Plaintiff sought social-work assistance, Ms. Banks provided only general phone numbers rather than the warm referral requested; Plaintiff filed a formal grievance with Dr. Bhat on March 19–20, 2026, copying GS attorneys, documenting the pattern of inadequate social-work support.

41.    Staff physically abused Plaintiff: Defendant Jackie slapped him; Defendants Yasmin and Fausi tore his skin as described above; Defendant Enrique threw surgical masks at him and ignored machine alarms; Defendant Fausi rushed his disconnection over his protest while he was dizzy and disoriented after 5.5 kilograms of fluid removal, slamming the touchscreen inches from his ear (June 14, 2024); Defendant Rosemary Johnson, Chief Technician, screamed at Plaintiff on the open treatment floor before a full house of patients — "You aint late because of no disability . . . this is a business who do you think you are" — and later disparaged Plaintiff to another patient's daughter, disclosing treatment information in violation of his privacy and

attributing his disability-related lateness and physician-validated need to eat to disrespect and laziness.

42.  Plaintiff witnessed a fellow patient, Mrs. Brower, die of cardiac arrest at chair 1 while Plaintiff sat at chair 6 directly facing her; the technician assigned to monitor her — Defendant Jackie, the same technician who slapped Plaintiff — had, upon information and belief, abandoned her station without securing coverage. Plaintiff, himself a heart-failure patient who has experienced cardiac emergencies during dialysis in that same facility, was within the zone of danger.

43.  Defendants refused and stonewalled Plaintiff's requests for billing records and incident reports to which he is legally entitled.

44.  Plaintiff repeatedly warned Defendants by email, over more than a year, that continued retaliation would result in a second lawsuit, and repeatedly (five to six times) asked Defendants and GS counsel how best to effect service so as not to disrupt other patients' treatment. He received no response.

**J. The ESRD Network Involuntary-Discharge Proceedings**

45.  Upon information and belief, ADMS transmitted communications by email, telephone, or electronic reporting system to IPRO/ESRD Network initiating or advancing involuntary-discharge proceedings against Plaintiff, transmitting the false narrative that Plaintiff was a disruptive patient requiring discharge rather than a medically complex patient whose written complaints exposed systemic failures. Involuntary discharge without guaranteed placement is, for a dialysis-dependent ESRD patient, functionally a death sentence. The ESRD Network process is not transparent to the patient, and Plaintiff is unaware of its current status.

**K. Motive, Pattern, and Institutional History**

46.   The following allegations are pled as evidence of motive, relatedness, continuity, and institutional practice. Plaintiff does not seek damages flowing from the settlements described in this Section.

47.   On May 6, 2015, the U.S. Attorney for the Southern District of New York announced an FCA settlement with Mattoo & Bhat Medical Associates, P.C. ("MBPC") — the medical practice of Defendant Dr. Bhat — under which MBPC admitted that it regularly performed and billed Medicare for vascular procedures on ESRD dialysis patients done only for surveillance purposes, in violation of Medicare billing rules, paying $1,000,000 and entering an HHS-OIG integrity agreement.

48.   On October 23, 2023, the U.S. Attorney for the Eastern District of New York announced FCA settlements exceeding $9.5 million with dialysis providers including NYRA — an ADMS-affiliated facility since 2001, under Dr. Bhat's medical direction, and a "sister" facility of CPKDC — resolving allegations that from 2000 through 2010 the clinics caused Medicaid to be double-billed for injectable drugs already paid within composite dialysis payments.

49.   Dr. Bhat previously headed Big Apple Dialysis Management, whose facilities' publicly reported mortality outcomes were 35% worse than comparable HHC facilities, with 41% of clinics rated "worse than expected" on mortality versus 9% nationally, and whose proposed expansion was blocked by state regulators, the Public Health and Health Planning Council, twenty nephrologists, the Public Advocate, the City Council Health Committee, and the nurses' union.

50. In a 2022 peer-reviewed article, Dr. Bhat — writing from ADMS's College Point address, which is also the address on CPKDC's operating license — described ADMS as a "nephrologist-owned" small dialysis organization whose "corporate executive management" sits "down with patients on the treatment floor to discuss issues," while also documenting a 65% year-over-year increase in patient mortality at ADMS's ETC-enrolled facilities in 2020 and describing severe financial pressures threatening to "price[] [ADMS] out of existence." Bhat, ETC Model, 29 Adv. Chronic Kidney Dis. 45 (2022). This establishes both the enterprise's unified structure under Dr. Bhat and its acute financial motive to suppress a patient whose complaints threatened additional regulatory scrutiny.

51. Before arriving at CPKDC, Plaintiff filed DOH Complaint No. NY00315255 against his prior facility, by letter dated July 27, 2023, the DOH confirmed that a survey conducted in response identified regulatory deficiencies in Physical Environment, Governance, and Infection Control, requiring corrective measures. That facility subsequently closed that location. Plaintiff informed Defendant Banks of this history in approximately July 2023. ADMS leadership thus knew from the outset that Plaintiff's complaints trigger actual state surveys with actual findings — knowledge that, for an organization with more than $10.5 million in prior federal fraud settlements, made Plaintiff's documented grievances an existential threat to its certification and revenue.

52. Before filing his December 2024 lawsuit, Plaintiff submitted multiple detailed written complaints (June–December 2024) to Flauta, Dr. Bhat, Banks, Dr. Stalbow, Dr. Koncicki, Abraham, and the ESRD Network, naming staff, describing incidents with dates, citing regulations, and in several instances referencing intent to pursue legal claims. The facility's

consistent response was minimal acknowledgment, no investigation, no corrective action, and recurrence — until the Second Circuit appeal.

**L. Goldberg Segalla's Knowledge**

53.  Throughout the retaliatory campaign, Green and Lazo were copied on or received Plaintiff's contemporaneous emails documenting care failures, safety complaints, and grievances — including the January 30, 2025 IV-medication safety complaint, the February 25, 2025 report of the overheard fabrication plotting, the February 3, 2025 dialyzer and homocysteine inquiries, the October 25, 2025 transportation failure, the March 12, 2026 temperature email, and the March 19–20, 2026 social-work grievance. They thus had direct, contemporaneous knowledge of the ongoing conduct. Upon information and belief, Green and Lazo directed, advised, or acquiesced in the escalating campaign.

54.  The escalation followed a coherent sequence, each step serving the same object — silencing Plaintiff's protected speech about his own care: informal suppression through social work (the Banks "gossip" incident); formal legal intervention (the January 30, 2025 letter); manufacture of a harassment narrative (the February 24, 2025 plotting); presentation of that narrative to a federal court; the post-dismissal Behavioral Plan; constructive denial of treatment (the chair-availability falsehoods and premature terminations); and finally involuntary-discharge proceedings. Each escalation followed the failure of the prior step.

## CAUSES OF ACTION

### COUNT I — ADA Interference and Retaliation, 42 U.S.C. § 12203(a), (b)

(Against All Defendants)

55.  Plaintiff repeats and realleges all preceding paragraphs.

56.  Plaintiff exercised ADA-protected rights by filing a federal disability lawsuit, requesting reasonable accommodations, reporting patient-safety concerns, filing grievances, and advocating for his health needs. Section 12203(b) prohibits "any person" from coercing, intimidating, threatening, or interfering with the exercise of such rights.

57.  Defendants coerced, intimidated, threatened, and interfered with those rights by: (a) the January 30, 2025 letter conditioning treatment on behavioral restrictions; (b) the May 10, 2025 Behavioral Plan threatening ER diversion; (c) lying about chair availability; (d) failing to arrange transportation, causing missed dialysis; (e) stonewalling records requests; (f) physical abuse; (g) prematurely terminating treatment and directing Plaintiff not to document it; (h) characterizing protected communications as "gossip"; and (i) initiating involuntary-discharge proceedings through the ESRD Network. Defendants Goldberg Segalla, Green, and Lazo are independently liable under § 12203(b) as "persons."

58.  The conduct forming the primary basis of this Count occurred after the April 29, 2025 dismissal of the prior action; pre-dismissal conduct is offered as background and as evidence of a continuing violation. This interference claim under § 12203(b) is legally distinct from the § 12203(a) retaliation claim previously dismissed. Plaintiff suffered emotional distress, physical harm from missed and inadequate treatments, and deprivation of statutory rights.

### COUNT II — Section 504 of the Rehabilitation Act; Olmstead Integration Mandate

(Against Atlantic, Hilario Flauta, CPKDC, and Goldberg Segalla)

59. Plaintiff repeats and realleges all preceding paragraphs.

60. Atlantic and CPKDC receive federal financial assistance through Medicare and Medicaid, which constitute substantially all of their revenue, and are subject to Section 504, 29 U.S.C. § 794. Plaintiff is an otherwise qualified individual with a disability whose needs are appropriately met in the community-based outpatient setting.

61. Defendants violated Section 504 and the integration mandate of Olmstead v. L.C. by directing Plaintiff to the emergency room for outpatient-appropriate care through the Behavioral Plan; lying about chair availability; cutting treatment short despite available chairs; imposing conditions on no other patient; and denying reasonable modifications to scheduling, transportation, and social-work support — repeatedly and unnecessarily forcing Plaintiff into emergency departments. Plaintiff suffered physical harm, emotional distress, and missed treatments.

### COUNT III — NYCHRL Retaliation, N.Y.C. Admin. Code § 8-107(7)

(Against All Defendants)

62. Plaintiff repeats and realleges all preceding paragraphs. Plaintiff engaged in protected activity by opposing disability discrimination through complaints and litigation. Defendants retaliated through the conduct described in ¶ 57, which was reasonably likely to deter a person from engaging in protected activity. The NYCHRL is construed liberally and independently of federal counterparts.

### COUNT IV — NYCHRL Aiding and Abetting, § 8-107(6)

(Against Goldberg Segalla, Green, Lazo, Ms. Banks, and Individual Defendants)

63. Plaintiff repeats and realleges all preceding paragraphs. Defendants Goldberg Segalla, Green, and Lazo aided and abetted Atlantic's discriminatory and retaliatory conduct by

drafting the January 30, 2025 letter; upon information and belief directing or approving the Behavioral Plan; advising a strategy of restricting Plaintiff's communications; receiving contemporaneous notice of ongoing failures and taking no corrective action; and making representations to the Court relying upon fabricated harassment allegations. The individual staff Defendants aided and abetted through the acts described herein.

### COUNT V — NYCHRL Coercion and Interference, § 8-107(19)

(Against All Defendants)

64. Plaintiff repeats and realleges all preceding paragraphs. Defendants coerced, intimidated, threatened, and interfered with Plaintiff's exercise of rights protected by the NYCHRL through the conduct described in ¶ 57.

### COUNT VI — NYSHRL Retaliation, N.Y. Exec. Law § 296(7)

(Against All Defendants)

65. Plaintiff repeats and realleges all preceding paragraphs. Defendants retaliated against Plaintiff for opposing practices forbidden by the NYSHRL through the conduct described in ¶ 57, in violation of Executive Law § 296(7), as liberally construed following the 2019 amendments.

### COUNT VII — NYSHRL Aiding and Abetting, § 296(6)

(Against Goldberg Segalla, Green, Lazo, Ms. Banks, and Individual Defendants)

66. Plaintiff repeats and realleges all preceding paragraphs and incorporates the aiding-and-abetting conduct described in ¶ 63, in violation of Executive Law § 296(6).

### COUNT VIII — Attorney Deceit, N.Y. Judiciary Law § 487

(Against Green and Lazo)

67. Plaintiff repeats and realleges all preceding paragraphs.

**68.** Green and Lazo engaged in deceit or collusion, or consented thereto, with intent to deceive the Court or a party, by: (a) presenting fabricated harassment allegations as established fact in the January 30, 2025 letter; (b) upon information and belief, relying upon those fabricated allegations in filings and representations to Judge Oetken; (c) representing that rescheduling would "waste" materials when every disposable component is shelf-stable for months to years and medications are not drawn until after patient arrival (¶ 32); (d) misrepresenting the requirements of 18 N.Y.C.R.R. §§ 505.10 and 505.11; and (e) exploiting Plaintiff's pro se status by portraying de minimis accommodations as unreasonable burdens in the belief Plaintiff could not marshal contradicting evidence. Lazo's characterization of Plaintiff's direct communications with ADMS leadership as "misconduct" is contradicted by his own client's published description of its culture as one where executives sit with patients on the treatment floor. Plaintiff was injured thereby, including through the corrupted disposition of the prior action, and seeks treble damages.

### COUNT IX — N.Y. Public Health Law §§ 2801-d and 2803-c

(Against Atlantic, CPKDC, and TCC/ArchCare)

**69.** Plaintiff repeats and realleges all preceding paragraphs. Defendants deprived Plaintiff of rights conferred by Public Health Law § 2803-c, including the right to courteous, fair, and respectful care (§ 2803-c(3)(g)), freedom from abuse and mistreatment (§ 2803-c(3)(h)), and the right to voice grievances without reprisal, through the abuse, premature terminations, retaliation, environmental hazards, and suppression described herein. TCC/ArchCare is liable under § 2801-d for injuries caused by the deprivation of such rights and benefits within its facility, including the temperature-control failures its ventilation system caused.

### COUNT X — Medical Battery

(Against Atlantic, Jackie, Yasmin, Fausi, and Enrique)

70. Plaintiff repeats and realleges all preceding paragraphs. Defendants intentionally engaged in offensive, non-consensual bodily contact: Jackie slapped Plaintiff; Yasmin and Fausi repeatedly tore his skin during tape removal despite his known EDS and over his objection; Fausi forcibly and painfully dismantled his access over his protest on June 14, 2024; Enrique threw objects striking Plaintiff. Atlantic is vicariously liable.

## COUNT XI — Medical Malpractice

(Against Atlantic, CPKDC, Dr. Bhat, and Nurse Lorna)

71. Plaintiff repeats and realleges all preceding paragraphs. Defendants departed from accepted standards of dialysis care by: maintaining an undersized dialyzer for twenty-three months; failing to monitor homocysteine despite a known MTHFR mutation; failing to individualize dialysate composition, causing severe secondary hyperparathyroidism; failing to summon 911 during a cardiac emergency; repeatedly terminating treatment prematurely without operational necessity; failing to maintain safe ambient temperature; severing PCP communication and bicarbonate coordination; and failing to provide routine electrocardiographic monitoring for a patient with documented structural heart disease. These cumulative departures proximately caused physical injury, cardiac strain, and increased risk of sudden cardiac death.

## COUNT XII — Intentional Infliction of Emotional Distress

(Against All Defendants)

72. Plaintiff repeats and realleges all preceding paragraphs. Defendants' extreme and outrageous course of conduct — weaponizing life-sustaining care against a captive patient through fabricated accusations, threats of discharge, public humiliation, physical abuse, and

constructive denial of treatment — was intended to and did cause severe emotional distress, exceeding all bounds of decency tolerated in civilized society.

### COUNT XIII — Negligent Infliction of Emotional Distress

(Against Atlantic, CPKDC, and Jackie)

**73.** Plaintiff repeats and realleges all preceding paragraphs. Defendants' breaches of duty unreasonably endangered Plaintiff's physical safety and caused him to fear for his life, including during the SVT/ambulance incident and the premature terminations. Separately, Plaintiff was within the zone of danger when Mrs. Brower died of cardiac arrest directly facing him while her assigned monitor had abandoned her station, causing Plaintiff — a heart-failure patient receiving identical treatment in the same section — grave fear for his own safety.

### COUNT XIV — Breach of Fiduciary Duty

(Against Atlantic, CPKDC, Dr. Bhat, and Ms. Banks)

**74.** Plaintiff repeats and realleges all preceding paragraphs. Defendants owed Plaintiff fiduciary duties arising from the provider-patient and social-worker-client relationships. They breached those duties by subordinating Plaintiff's welfare to institutional self-protection: suppressing his grievances, disparaging him to other patients, withholding social-work services, disclosing his treatment information, and participating in the retaliatory campaign. Plaintiff was damaged thereby.

### COUNT XV — Tortious Interference with the Patient-Provider Relationship

(Against Goldberg Segalla, Green, and Lazo)

**75.** Plaintiff repeats and realleges all preceding paragraphs. Plaintiff had a protected relationship with his treating facility and providers. GS, Green, and Lazo intentionally interfered by directing or advising the imposition of punitive behavioral conditions, restricting Plaintiff's

communications with his own care providers, directing him toward the emergency room, and, upon information and belief, advising ADMS it had no transportation obligation or providing cover for its failure to meet that obligation, and by raising false and exaggerated concerns to the ESRD Network to create a pretext for retaliatory discharge. The Noerr-Pennington doctrine does not protect these direct, coercive missives to a patient, which are not petitioning activity, and in the alternative fall within the sham exception.

## COUNT XVI — Negligence: Premises Liability and Environmental Hazard

### (Against Atlantic, CPKDC, and TCC/ArchCare)

**76.** Plaintiff repeats and realleges all preceding paragraphs. Defendants breached their duty to maintain safe premises by exposing anemic ESRD patients to freezing ventilation drafts with broken thermometers, leaking and molded ceilings, loose and exposed wires, and related hazards of which Defendants had actual written notice, including Plaintiff's March 12, 2026 email, proximately causing hemodynamic stress and physical harm.

## COUNT XVII — Civil RICO, 18 U.S.C. § 1962(c)

### (Against Atlantic, CPKDC, Dr. Bhat, Flauta, Ms. Banks, and Nurse Lorna)

**77.** Plaintiff repeats and realleges all preceding paragraphs.

**78.** Enterprise. At all relevant times, ADMS, CPKDC, NYRA, MBPC, Ridgewood Renal & Medical Associates, P.C., and their affiliated entities constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "ADMS Enterprise"), associated for the common purpose of operating a network of dialysis facilities, maximizing federal-program revenue therefrom, and suppressing complaints and regulatory scrutiny threatening that revenue. The Enterprise has structure, longevity, and relationships among its members: common ownership, a common medical director (Dr. Bhat), shared management, and sister-facility

relationships, as confirmed by ADMS's own publications. Each named Defendant in this Count is a person distinct from the Enterprise who conducted or participated in the conduct of the Enterprise's affairs — not merely his, her, or its own affairs — through the pattern below.

79.    Interstate Commerce. The Enterprise engages in and affects interstate commerce through Medicare and Medicaid reimbursement transmitted across state lines, interstate wire communications, and interstate care coordination, including transportation arrangements for Plaintiff's kidney-transplant evaluation in Charleston, West Virginia.

80.    Predicate Acts — Wire Fraud (18 U.S.C. § 1343). Defendants conducted the Enterprise's affairs through a scheme to defraud Plaintiff of money and property — namely, to cause Plaintiff to bear transportation costs the Enterprise was legally obligated to bear, and to preserve Enterprise revenue by deceptive means — executed through the following interstate wire communications, among others: (a) email and telephonic representations to Plaintiff, on dates including October 25, 2025 and others reflected in Plaintiff's email record, that ADMS/CPKDC bore no obligation to arrange or adjust Plaintiff's Medicaid NEMT transportation, when 18 N.Y.C.R.R. §§ 505.10 and 505.11 and MAS procedures placed that obligation on the facility — misrepresentations that directly caused Plaintiff to expend his own funds on cab, Uber, and Lyft transportation to and from dialysis; (b) the March 7, 2026 telephonic statement that "we don't have a space," contradicted by Plaintiff's contemporaneous documentation of four empty chairs, made in furtherance of the scheme to constructively deny treatment; (c) the transmission of the May 10, 2025 Behavioral Plan on Ridgewood letterhead, designed to disguise its origin within the Enterprise as an independent clinical determination; and (d) upon information and belief, electronic communications to IPRO/ESRD Network transmitting the false "disruptive patient" narrative to advance involuntary discharge.

81.   Predicate Acts — Witness Tampering and Retaliation (18 U.S.C. §§ 1512, 1513). Plaintiff was a party and witness in an official proceeding — the federal action before Judge Oetken and the appeal now pending in the Second Circuit — and had communicated, and made known his intention to continue communicating, to a federal judge information relating to possible federal offenses, including fraud upon federal healthcare programs and unlicensed administration of intravenous medication. Defendants, with the requisite intent, engaged in and threatened conduct to influence, delay, prevent, and retaliate for that participation and those communications, including: the January 30, 2025 demand that Plaintiff cease his written complaints; the Behavioral Plan issued eleven days after dismissal; the March 21, 2026 premature termination coupled with Nurse Lorna's directive that Plaintiff not document the incident; Ms. Banks's suppression of patient-to-patient communication; and the initiation of involuntary-discharge proceedings — each act intended to hinder, delay, or prevent Plaintiff's communication of information to a judge of the United States and to retaliate against him for his prior truthful filings and testimony, in violation of §§ 1512(b)(3), 1512(d), and 1513(e), each an enumerated racketeering act under § 1961(1).

82.   Pattern, Relatedness, and Continuity. The predicate acts share the same purpose (protecting the Enterprise's federal revenue by suppressing scrutiny), the same principal victim (Plaintiff), the same methods (deception and coercion transmitted by wire), and the same participants, and they threaten continued repetition: the Enterprise's involuntary-discharge effort remains pending, its regulatory noncompliance is ongoing, and its conduct toward Plaintiff is its regular way of doing business with respect to patients who complain, as its institutional history demonstrates. The Enterprise's documented history — the 2015 MBPC admissions, the 2023 NYRA settlement, and the Big Apple mortality record (¶¶ 46–51) — is alleged as evidence of

the relatedness, continuity, and open-ended threat of the pattern and of the Enterprise's regular way of doing business, not as predicate acts for which Plaintiff seeks damages.

83. RICO Injury and Proximate Causation. Plaintiff was injured in his business or property directly and by reason of the predicate acts, including: out-of-pocket transportation expenditures (cab, Uber, Lyft, and transit fares) proximately and directly caused by the wire-transmitted misrepresentations regarding the Enterprise's transportation obligations, upon which Plaintiff relied; and expenses incurred by reason of the constructive denial of treatment effected through the chair-availability falsehoods. These are concrete economic losses recoverable under § 1964(c). See Medical Marijuana, Inc. v. Horn, 604 U.S. ___ (2025). The causal chain is single-step: Defendants' false statements to Plaintiff caused Plaintiff's own expenditures. Plaintiff is entitled to treble damages and costs under § 1964(c).

### COUNT XVIII — Civil RICO Conspiracy, 18 U.S.C. § 1962(d)

(Against All Enterprise Defendants, Goldberg Segalla, Green, and Lazo)

84. Plaintiff repeats and realleges all preceding paragraphs.

85. Defendants, including Goldberg Segalla, Green, and Lazo, conspired to violate § 1962(c) by agreeing that the conduct of the Enterprise's affairs would be carried out through a pattern of racketeering activity, and by agreeing to facilitate that scheme. A § 1962(d) defendant need not himself operate or manage the enterprise; it suffices that he knowingly agreed to further the endeavor which, if completed, would satisfy § 1962(c). *Salinas v. United States,* 522 U.S. 52, 65 (1997).

86. The agreement is evidenced circumstantially by: the January 30, 2025 GS letter issuing behavioral restrictions later mirrored in the facility's May 10, 2025 Behavioral Plan; the coordinated timing of that Plan eleven days after the dismissal GS obtained; the transmission of

the staff's reframed harassment narrative to GS for use in filings; GS's contemporaneous receipt of Plaintiff's documentation of care failures paired with the facility's consistent non-correction; and the alignment of the ESRD Network submissions with the narrative GS constructed. Plaintiff was injured by overt acts in furtherance of the conspiracy as alleged in ¶¶ 80–83.

### COUNT XIX — Assault

(Against Atlantic, Jackie, Enrique, Yasmin, and Fausi)

87. Plaintiff repeats and realleges all preceding paragraphs. Defendants' conduct — striking, throwing objects at, and forcibly handling Plaintiff — placed him in imminent apprehension of harmful and offensive contact. Atlantic is vicariously liable.

### COUNT XX — Declaratory Judgment

(Against All Defendants)

88. Plaintiff repeats and realleges all preceding paragraphs. An actual controversy exists concerning Plaintiff's right to receive dialysis free of retaliation and the lawfulness of Defendants' conduct. Plaintiff seeks a declaration pursuant to 28 U.S.C. §§ 2201–2202 that Defendants' conduct violated the statutes and duties pled herein.

### COUNT XXI — 42 U.S.C. § 1983: First and Fourteenth Amendments

(Against Atlantic, Goldberg Segalla, Green, Lazo, Nurse Lorna, Ms. Banks, and Flauta)

89. Plaintiff repeats and realleges all preceding paragraphs. Solely in the narrow contexts of (a) invoking the ESRD Network's government-delegated pre-clearance authority over involuntary discharge and (b) ADMS's gatekeeping role over the state-administered NEMT benefit, Defendants acted under color of state law. In those capacities Defendants retaliated against Plaintiff for protected speech and petitioning — initiating discharge proceedings,

imposing the Behavioral Plan, and degrading his care — in violation of the First and Fourteenth Amendments.

## COUNT XXII — New York Constitution, Article I, § 8

(Against Atlantic, Goldberg Segalla, Green, Lazo, Flauta, Nurse Lorna, Pauline, Ms. Banks, and Jagdeo)

90.  Plaintiff repeats and realleges all preceding paragraphs. Defendants' campaign to suppress and punish Plaintiff's speech about his own medical care violated the free-speech guarantee of Article I, § 8 of the New York Constitution, which affords broader protection than its federal counterpart.

## COUNT XXIII — Declaratory Judgment: Retaliatory Involuntary Discharge

(Against Atlantic, Flauta, Goldberg Segalla, Green, Lazo, Nurse Lorna, and Ms. Banks)

91.  Plaintiff repeats and realleges all preceding paragraphs. Because the ESRD Network discharge process is by design opaque to the patient, and because involuntary discharge would be a functional death sentence, Plaintiff seeks a declaration that any involuntary discharge initiated or advanced in retaliation for Plaintiff's protected grievances and litigation — grievances he is entitled to raise "without reprisal or denial of services," 42 C.F.R. § 494.70(a)(16) — is unlawful, and injunctive relief barring Defendants from effecting such a discharge.

## COUNT XXIV — Conspiracy to Deprive of Equal Protection, 42 U.S.C. § 1985(3)

(Against All Defendants)

92.  Plaintiff repeats and realleges all preceding paragraphs. Defendants — separate persons and entities including outside counsel — conspired, motivated by class-based animus toward disabled patients who assert their rights, to deprive Plaintiff of equal protection and equal

privileges and immunities, and committed overt acts in furtherance, including the letter, the Behavioral Plan, the false statements, and the discharge proceedings, injuring Plaintiff.

## COUNT XXV — Conspiracy to Obstruct Justice and Deter Federal-Court Participation, 42 U.S.C. § 1985(2)

(Against All Defendants)

93. Plaintiff repeats and realleges all preceding paragraphs. Defendants conspired to deter Plaintiff, by intimidation and threat, from attending and testifying freely in a court of the United States, and to injure him for having attended and testified and for enforcing his right to equal protection — through the cease-and-desist letter, the fabricated narrative presented to the Court, the Behavioral Plan, the treatment denials, and the discharge proceedings, each an overt act injuring Plaintiff in his person and property.

## COUNT XXVI — Negligent Retention

(Against Atlantic and CPKDC)

94. Plaintiff repeats and realleges all preceding paragraphs. Atlantic knew, through Plaintiff's detailed written complaints from June 2024 onward, of its employees' propensity for abuse — including Jackie's slap, Yasmin's and Fausi's skin-tearing, Enrique's thrown objects and ignored alarms, Rosemary Johnson's public tirades, and unlicensed administration of IV medication — yet retained each employee without investigation or discipline, proximately causing Plaintiff's subsequent injuries.

## COUNT XXVII — Negligent Supervision

(Against Atlantic, CPKDC, and TCC/ArchCare)

95. Plaintiff repeats and realleges all preceding paragraphs. Defendants failed to supervise staff performing safety-critical functions — permitting unlicensed technicians to push

IV medication, permitting assigned monitors to abandon stations (as when Mrs. Brower died), permitting charge nurses to terminate treatments without clinical or operational justification, and permitting the abusive conduct described herein — proximately causing Plaintiff's injuries.

### COUNT XXVIII — Failure to Prevent Conspiracy, 42 U.S.C. § 1986

(Against Atlantic, CPKDC, Dr. Bhat, Flauta, and Goldberg Segalla)

96. Plaintiff repeats and realleges all preceding paragraphs. Each of these Defendants had knowledge of the § 1985 conspiracies alleged herein, had power to prevent or aid in preventing their commission, and neglected or refused to do so, and is liable to Plaintiff for the wrongs committed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment:

a. Awarding compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

b. Awarding punitive damages against all Defendants;

c. Awarding treble damages under 18 U.S.C. § 1964(c) and N.Y. Judiciary Law § 487;

d. Awarding damages under N.Y. Pub. Health Law § 2801-d against TCC/ArchCare, and under 42 U.S.C. §§ 1985(2), 1985(3), and 1986 against all Defendants;

e. Enjoining Defendants from retaliating against Plaintiff and from effecting any involuntary discharge initiated or advanced in retaliation for protected activity;

f. Ordering Atlantic to provide Plaintiff's dialysis in the most integrated community-based setting appropriate to his needs, and barring ER diversion absent bona fide operational or medical necessity;

g. Ordering Atlantic to train at least two staff members on MAS transportation procedures, one of whom is always available during operating hours; to implement non-retaliatory grievance procedures compliant with CMS Conditions for Coverage; to require visible staff identification; and to produce requested medical and treatment records within thirty days;

h. Declaring that Defendants' conduct violated the ADA, Section 504, the NYCHRL, the NYSHRL, Public Health Law §§ 2801-d and 2803-c, and Judiciary Law § 487;

i. Awarding pre- and post-judgment interest, costs, and fees to the extent permitted by law; and

j. Granting such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated: New York, New York

July 21, 2026

Respectfully submitted,_____**Jason Wimberly, Pro Se**